OPINION
{¶ 1} This case is before us on the appeal of Thomas Murph (Tom) from a trial court decision on spousal support and division of property. In support of the appeal, Tom raises five assignments of error. We will list each assignment separately during our discussion. For now, we simply indicate that the assignments of error are without merit and that the trial court judgment will be affirmed.
 I {¶ 2} Tom and Doris Murph were married on December 28, 1968, and separated on August 1, 2001, more than 32 years later. At the time of the marriage, Tom owned two apartment buildings and an airplane. Although those items were sold long before the divorce, Tom contended at trial that the proceeds were traceable and that he should be awarded existing property that the parties owned. The primary dispute on appeal involves the trial court's decision to award Doris an interest in most of the property.
 {¶ 3} In the first assignment of error, Tom contends that "the trial court erred when it failed to determine that property located on Valerie Drive was traded for the Heather Street Property because both parties testified that the Heather Property owned by Appellant prior to marriage along with the additional units of Heather property purchased during marriage were traded for the Valerie Arms property." Tom also includes two sub-issues, which relate to the court's decision about a limited family partnership and the court's failure to include remodeling costs in the valuation of the Valerie Arms property. We will address all these issues.
 {¶ 4} Valerie Arms is an apartment building that was purchased during the parties' marriage, in 1971, and it was valued, at the time of divorce, at $225,000. In 1998, Valerie Arms was placed, along with other property, in a limited family partnership called TDM Family Limited Partnership (TDM). Tom and Doris were limited partners and each owned 49.5% of TDM. The remaining 1% was owned by TODA LCC, which was also the general partner. In turn, Tom owned 100% of the membership interest in TODA.
 {¶ 5} In deciding that Valerie Arms was a marital asset, the trial court first noted the presumption that property acquired during marriage is marital, absent evidence to the contrary. The court then resolved credibility issues and conflicts in testimony in favor of Doris, and divided Valerie Arms in accordance with the ownership interests in TDM. Among other things, the court found that Tom failed to trace ownership back to separate money. Specifically, the court found insufficient evidence to indicate that previous property (the Heather Street property) had been "traded" for Valerie Arms. In fact, the court said it could not determine, based on the evidence presented, what happened to the proceeds from the sale of the Heather Street property.
 {¶ 6} Tom claims this is error, because the testimony ofboth parties established that the Heather Street property was "traded" for Valerie Arms. Additionally, Tom relies on a chart in which he detailed his separate property claims, and on a loan payment book that he used in analyzing the acquisition of the Heather Street property.
 {¶ 7} In actions for divorce, trial courts must classify property as marital or separate, and must distribute separate property to the owner, where appropriate. R.C. 3105.171(B) and (D). Classification of property is governed by R.C. 3105.171(A), which provides, in pertinent part that marital property includes:
 {¶ 8} "(i) All real and personal property that currently is owned by either or both of the spouses, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;
 {¶ 9} "(ii) All interest that either or both of the spouses currently has in any real or personal property, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;
 {¶ 10} "(iii) Except as otherwise provided in this section, all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage." R.C.3105.171(A)(3)(a).
 {¶ 11} Separate property is defined under the statute as:
 {¶ 12} "all real and personal property and any interest in real or personal property that is found by the court to be any of the following:
 {¶ 13} "(i) An inheritance by one spouse by bequest, devise, or descent during the course of the marriage;
 {¶ 14} "(ii) Any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage;
 {¶ 15} "(iii) Passive income and appreciation acquired from separate property by one spouse during the marriage * * *." R.C.3105.171(A)(6)(a).
 {¶ 16} Furthermore, R.C. 3105.1719B) (6)(b) provides that "commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable."
 {¶ 17} Trial courts have broad discretion in dividing property in domestic cases. Berish v. Berish (1982),69 Ohio St.2d 318, 319. As a result, we review a trial court's division of property under an abuse of discretion standard. Mays v.Mays, Miami App. No. 2000 CA 54, 2001-Ohio-1450, 2001 WL 1219345, *3. Abuse of discretion means that the court acted arbitrarily, unreasonably, or unconscionably. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 18} On the other hand, "classification of property as marital or separate must be supported by the manifest weight of the evidence." Mays v. Mays, Miami App. No. 2000 CA 54, 2001-Ohio-1450, 2001 WL 1219345, *3. Under this latter standard, we "`review the evidence, and * * * determine whether, when appropriate deference is given to the factual conclusion of the trial court, the evidence persuades us by the requisite burden of proof.'" Id. (citation omitted).
 {¶ 19} After reviewing the evidence, we agree with the trial court that Tom failed to adequately trace the property proceeds. Under established law, "[t]he party seeking to have a particular asset classified as separate property has the burden of proof, by a preponderance of the evidence, to trace the asset to separate property." Peck v. Peck (1994), 96 Ohio App.3d 731, 734.
 {¶ 20} Tom presented numerous documentary exhibits at trial, but noticeably absent were information and proof pertinent to the acquisition, sale, and value of the apartment buildings purchased before and after marriage. Instead, Tom simply testified about what he did, without supporting documentation.
 {¶ 21} In this regard, Tom testified that he purchased two apartment buildings before marriage (318 and 320 Heather). According to Tom's 1967 tax return, 318 Heather was purchased in February, 1966, for $43,000. Tom did not provide the court with any contracts of sale or loan agreements, or even the entire loan book for this property. Instead, he submitted partial pages of a loan book, showing payments made between October 5, 1967 and June 10, 1969, on a $42,000 loan (with some dates missing). According to the loan book, the loan was paid down to $38,302 by the time the parties married in December, 1968. Tom's equity in the property before marriage would have been only about $4,968 (the difference between the purchase price and the loan amount ($1,000), plus payments of principal).
 {¶ 22} 320 Heather was apparently acquired in October, 1966, at least according to the 1967 tax return. Again, no contracts of sale or loan agreements were provided. The tax return indicates that the property was purchased for $33,000. The loan amount was $28,000, and the loan book indicates that $26,624 was still owed at the time of marriage. Consequently, Tom's equity in 320 Heather before marriage would have been around $6,376.
 {¶ 23} Tom also testified that the parties jointly purchased a third Heather St. property (326 Heather) after their marriage, in May, 1970. He did not say what the purchase price of this property was, nor did he indicate if any down payment was made. No loan book existed for this property, as the parties apparently borrowed the money from Tom's grandmother. Tom did not establish the amount of this loan, nor did he say how it was paid. In fact, he failed to submit any documents that would indicate the cost of 326 Heather, the amount financed, or any equity that may have existed at the time it was ultimately sold.
 {¶ 24} According to Tom, all three Heather properties were "traded" for the Valerie Arms property, in 1971. Tom did not give the court any documentation indicating what the terms of this "trade" were. He also did not testify about the fair market value of any of the properties at the time of the trade and did not reveal how the existing loans were satisfied. More important, the only documentation that was provided contradicts the idea of a "trade."
 {¶ 25} Specifically, Tom submitted part of a loan book for Valerie Arms beginning with July, 1971. The loan amount is $110,000, meaning that at least $110,000 worth of Valerie Arms' purchase price was not "traded," but was financed. In the absence of proof otherwise, we must assume that $110,000 was the fair market value of the property at the time. We note that some 30 years later, the property was appraised at only $225,000.
 {¶ 26} Furthermore, the loan book for Valerie Arms is listed in the name of both Tom and Doris, whereas the loan books for the two Heather Street properties were in only Tom's name. As a result, Doris appears to have been legally obligated on the loan — which is consistent with her testimony that the parties considered Valerie Arms to be "their property," i.e., marital property.
 {¶ 27} In the absence of evidence about the fair market value of the Heather and Valerie Arms properties at the time of sale or "trade," the terms of the "trade," and any profit or loss on the properties that were traded, we must agree with the trial court that Tom failed to adequately trace Valerie Arms to separate assets. Even if Tom had approximately $11,000 in equity in the Heather properties at the time of marriage, the properties could have declined in value or could have been "traded" at a loss. Tom had the burden of proving that Valerie Arms was separate property, but failed to meet his burden.
 {¶ 28} Although Tom submitted a chart in which he asserted that Valerie Arms was separate property, statements on charts, without supporting documentation, prove nothing. In this regard, Tom claims that cases requiring documentation of assets precedeMiddendorf v. Middendorf, 82 Ohio St.3d 397, 1998-Ohio-403, which allegedly held that "when property can be traced to separate property and neither spouse has made efforts causing appreciation in its value or income, then the property should be deemed wholly separate."
 {¶ 29} This statement does not accurately reflect the holding in Middendorf, because that case did not involve issues about when property should be deemed separate. Instead, the issue before the court was whether, after property has been found to be separate, both parties must expend labor, money, or in-kind contributions before the appreciation in value is considered a marital asset. 82 Ohio St.3d at 399 (emphasis added).Middendorf also did not discuss the issue of "documentary evidence."
 {¶ 30} In Middendorf, the trial court found that a stockyard owned by a husband before marriage was his separate property. Based on testimony from a certified public accountant about the stockyard's value at the time of marriage and at the time of divorce, the trial court concluded that the stockyard had increased in value during marriage by $108,541. The trial court then awarded the wife one-half the increase in value. Id. at 398.
 {¶ 31} On appeal, the husband claimed that before a trial court can decide that an increase in the value of separate property is marital, it must find that both spouses "expended significant funds or labor directly contributing to the increase or that the non-owning spouse must contribute substantial work to improvement and maintenance of the separate property." Id. at 399. However, the Ohio Supreme Court disagreed. The court first commented that under the relevant statute, an increase in value is deemed marital property whenever "either spouse makes a labor, money, or in-kind contribution that causes an increase in value." Id. at 401, interpreting R.C. 3105.17(A)(3)(iii) (emphasis in original). The court distinguished this situation from passive appreciation, which remains separate property.
 {¶ 32} After reviewing the evidence, the Supreme Court found that the husband's efforts had contributed to the stockyard's appreciation in value during marriage. Accordingly, the court affirmed the finding that the appreciation was marital property, not separate property. Id. at 403.
 {¶ 33} In the present case, the trial court did not find Valerie Arms to be separate property. As a result, the trial court did not reach the question involved in Middendorf, i.e., whether any appreciation in value was due to efforts or contributions of either party during the marriage, and was, therefore, marital property.
 {¶ 34} The issue decided by the trial court in this case was whether Tom adequately traced separate property. We have previously noted that some courts find documentary evidence necessary for tracing assets back to non-marital property. SeeKarg v. Karg (Feb.25, 2000), Greene App. No. 99 CA 91, 2000 WL 216950, *2, and Mumma v. Mumma (March 4, 2000), Clark App. No. 99 CA 32, 2000 WL 299549, *3. The reason for this is that courts must have some basis upon which to make decisions, particularly where the testimony of the parties conflicts, as it often does in divorce cases. Because Tom failed to provide adequate evidence, the trial court did not err in finding that Valerie Arms was marital property.
 {¶ 35} We also find no error in the trial court's decisions on the limited family partnership and the remodeling costs for Valerie Arms. This property was apparently titled in Tom's name at the time of its purchase, even though both parties were obligated on the loan. Subsequently, in 1998, title to Valerie Arms and other property was transferred to TDM, which was a limited family partnership in which both Tom and Doris owned approximately equal shares. After deciding that Valerie Arms was marital property, the trial court divided it in accordance with the parties' respective shares in TDM. Tom claims this was error because the parties formed the limited partnership only because they had been involved in litigation and wanted to protect their assets from future lawsuits.
 {¶ 36} We find no error in the trial court's decision because the existence of the partnership has no bearing on the relevant issues. No matter what reasons the parties had for placing their property in a partnership, the fact is that Valerie Arms was marital property before and after the partnership was created.
 {¶ 37} We also find no error in the trial court's decision to ignore testimony on remodeling costs. An appraisal was performed on various properties, at Tom's request. At trial, Tom presented the appraisal, which had been done on an "as-is" basis, as of March 29, 2001. At that time, Valerie Arms was valued at $225,000.
 {¶ 38} Although Tom was the party offering the appraisal, he appears to have tried to contradict or change his own appraisal report at trial, by presenting testimony from Ken Foster, of Fomax Home Remodeling. At Tom's request, Foster prepared an estimate of $137,850, for proposed remodeling costs for Valerie Arms. These costs included a new roof, resurfacing of the driveway and carport, new windows, new furnaces, and completely new kitchens for seven apartment units. The court found that this work, which was to be done over the next five years, was ordinary maintenance. The court also found that, as such, the work had already been considered in the prior appraisal report.
 {¶ 39} We agree with the trial court. Tom's expert did not indicate that any of the items that were to be replaced or remodeled were currently broken, leaking, or in direct need of immediate repair. Accordingly, the appraisal of the property "as is" would have taken such matters into consideration.
 {¶ 40} Because the trial court did not err in dividing or in valuing the Valerie Arms property, the first assignment of error is without merit and is overruled.
 II {¶ 41} In the second assignment of error, Tom contends that the trial court erred in finding that the Cyril Court property was marital. Specifically, Tom claims that the property was acquired with separate money that he obtained from the sale of his airplane.
 {¶ 42} The Cyril Court property was purchased in August, 1996, during the marriage. As with Valerie Arms, Tom had the burden of tracing Cyril Court to separate property. Peck,96 Ohio App.3d at 734. He attempted to do this by submitting documents showing that he received about $173,000 in June, 1996, for the sale of a Cessna airplane that allegedly was his separate property. Tom claimed that he invested part of the money in another airplane, deposited some money in a joint marital account, and used the rest ($86,000) to purchase the Cyril Court property. Cyril Court was not an apartment complex, but was a single-family home.
 {¶ 43} In discussing the Cyril Court property, the trial court noted that Tom failed to submit a cancelled check, bank receipt, or any other document establishing that he used money from a separate account to pay for Cyril Court. The court also noted that Doris signed a mortgage note for the property. Consequently, the court found the property to be marital.
 {¶ 44} In addition, the trial court observed that although Doris thought Cyril Court was being purchased for the parties' son, Tom's female companion and her children lived there, while Tom paid the expenses for the property and did not charge any rent. The record does not clearly indicate how long this living arrangement went on. However, it was in effect for some time before the divorce hearing. The actual relationship between Tom and his companion began in 1996 (the same year Cyril Court was purchased), and it was still ongoing at the time of the divorce hearing, about seven years later. There was also no evidence presented to indicate that the parties' son ever lived at Cyril Court.
 {¶ 45} The above circumstances might have supported a finding of financial misconduct. However, the trial court noted that Doris did not ask for such a finding. Nonetheless, the facts and lack of documentation did not enhance Tom's credibility.
 {¶ 46} After reviewing the record, we agree with the trial court that the Cyril Court property was marital. We also believe the court correctly focused on the lack of documentary evidence supporting Tom's claims. As we stressed earlier, even if documentary proof may not be essential in all situations, it certainly helps when facts are disputed or credibility is at issue.
 {¶ 47} As an additional matter, the documents Tom did submit failed to support his testimony. Specifically, Tom claimed that he mortgaged Cyril Court to fund payment of a lawsuit that resulted in about $101,000 in expenses, including $48,000 in attorney fees. The lawsuit involved an apartment that the Murphs allegedly refused to rent to individuals who were HIV positive.
 {¶ 48} Doris signed a $68,800 mortgage for the Cyril Court property on November 26, 1996. However, the lawsuit against the Murphs was not even filed until March 16, 1997. While some legal fees can possibly accrue before lawsuits are filed, the mortgage was taken out only a month after the incident giving rise to the lawsuit. At such a point, it would be highly unusual for $68,800 in expenses to have arisen. Nonetheless, if, in fact, that is what occurred, it could have been verified by bills or other documentary evidence showing the expenses. Because no such evidence was submitted, the discrepancy raises an issue about credibility.
 {¶ 49} Moreover, Doris testified that when the lawsuit began, she and Tom were represented by an attorney from their insurance company. When the insurance company decided the matter could not be handled through the company, the Murphs hired their own attorney. According to Doris, that occurred when they were half-way through the deposition process. Again, this testimony conflicts with Tom's account.
 {¶ 50} Another pertinent factor is that Doris signed a cognovit note on November 26, 1996, promising to pay Tom the balance due on the Cyril Court mortgage. This was in addition to the mortgage, which was enforceable on its own terms against Doris. Although Tom was also obligated on the cognovit note, he was the holder of the note, meaning that his only "obligation" was to pay money to himself. Furthermore, as the holder, Tom could declare the note due and obtain judgment against Doris without notice or demand. And finally, the parties are identified on the note as "Thomas D. Murph and Doris B. Murph dba Tom Murph Apartments," which is yet another indication that they jointly owned and controlled their properties.
 {¶ 51} For the above reasons, the trial court did not err either in finding that Cyril Court was marital or in dividing the property equally in between the parties.
 III {¶ 52} In the third assignment of error, Tom challenges the trial court's failure to award him the Dorset property. In September, 1998, Tom and his sister each inherited an undivided one-half interest in an apartment building (4245-4257 Dorset Drive). Tom signed a contract agreeing to purchase his sister's interest for $77,500. Once again, Doris co-signed a mortgage loan, this time for $100,000, which included the cost of the property, plus about $19,943 in cash that was given back to the Murphs. The sister's undivided half interest was conveyed to both Doris and Tom Murph in a survivorship deed, in which Doris waived all dower rights, even though she was obligated on the mortgage loan.
 {¶ 53} In November, 1998, both Tom and Doris signed a quit-claim deed, transferring their interest in Dorset to the TDM partnership. At the time of the divorce hearing, a $98,000 mortgage still existed, and the property was valued at about $155,000.
 {¶ 54} The trial court found that one-half of the Dorset property was Tom's separate property. However, the court found the rest of the property marital and divided the interest according to the parties' respective interests in TDM. The result was that Tom was awarded $42,892.50 and Doris received $14,107.50 of the $57,000 equity in the property. Tom contends this was error, because he allegedly used a majority of proceeds from the sale of a separate property (200 Northwood) to make a down payment on his sister's interest in the Dorset property. Tom also claims that Doris was only included on the mortgage because he was married and the bank required it. As an initial point, we note that Tom's statement on appeal about a down payment is inconsistent with his own evidence. At trial, Tom submitted a contract in which he had agreed to purchase his sister's (Linda Meyers') interest in Dorset for $77,500. He also submitted a settlement statement for the Dorset property that listed Doris and Tom as the "borrowers" and Linda Meyers as the "seller." The settlement statement indicates that a distribution of $77,500 was made to Linda Meyers. This was the precise amount of the contract price. It also happens to be exactly one-half the value at which the property was appraised at the time of the divorce ($155,000).
 {¶ 55} In addition, while the settlement statement contains an area where a deposit or down payment can be listed, that space was left blank. The fact that the settlement statement did not reflect a down payment is consistent with Tom's trial testimony, which did not mention any down payment on the Dorset property.
 {¶ 56} The upshot is that the documents and trial testimony are consistent with each other, but are inconsistent with Tom's argument on appeal. Again, the inconsistencies detract from the credibility of Tom's position.
 {¶ 57} Tom's second point in connection with this assignment of error is that Doris had to be included on the mortgage because they were married. However, Tom failed to present any evidence that a spouse's signature is always required on mortgage loans. Although Tom made a statement to that effect, testimony from a loan officer would have been more persuasive. Furthermore, even if a spouse's signature is required, it hardly seems equitable to impose such a financial burden without granting a corresponding interest in the property.
 {¶ 58} Accordingly, the third assignment of error is without merit and is overruled.
 IV {¶ 59} In the fourth assignment of error, Tom claims that "the trial court erred when it failed to award the Intel stock as the separate property of Appellant because the preponderance of the evidence shows Appellant purchased the stock from the money received from the sale of his property at 200 Northwood." Again, we disagree.
 {¶ 60} On a financial disclosure affidavit, Tom listed 700 shares of Intel Stock that were titled in his name, and were valued at $25,000. At trial, testimony about the stock was minimal. Tom simply claimed that he purchased the stock with the proceeds from the sale of separate property he owned (200 Northwood). He did not submit any documents indicating when the stock was purchased or what the purchase price was, nor did he trace the purchase to a particular account. Documents would have been available that could have established these matters. Moreover, while Tom claimed 200 Northwood was purchased with separate funds in May, 1994, he did not give the court documentation to support this claim, either. Again, we stress that statements from parties on charts are of little value when they are not supported by documents that ought to be readily available.
 {¶ 61} More important, the charts conflict with Tom's testimony. Specifically, Tom testified that he deposited $65,000 in proceeds from the sale of 200 Northwood in his separate savings account at Union Savings Bank. He also testified that he loaned part of the proceeds ($41,000) to Doris to use as a down payment for a house she bought during the divorce proceedings. Because Tom testified that he also purchased Intel stock with the proceeds from the sale of 200 Northwood, that would mean that the purchase price of the stock was $24,000 ($65,000 minus $41,000).
 {¶ 62} In contrast, Tom explained on Ex. 63 (one of two handwritten charts listing his property transactions), how he used the $65,000 net proceeds from the sale of 200 Northwood. According to Ex. 63, Tom paid $29,000 for the Intel stock and also loaned $36,000 to Doris for the down payment on her house. These figures obviously conflict with his testimony.
 {¶ 63} The parties also signed and filed a document with the trial court during the pendency of the divorce case that conflicts with Tom's trial testimony. As we mentioned, Tom testified that he deposited the proceeds from the sale in an account at Union Savings Bank. However, the document filed with the court states that the $41,000 was being held in an account at Monroe Federal. See Doc. #12.
 {¶ 64} Even if we chose to overlook the lack of documentation for any of the transactions Tom relies on, these inconsistencies create significant credibility issues. Accordingly, the trial court did not err in finding that the Intel stock was a marital asset. The fourth assignment of error, therefore, is without merit and is overruled.
 V {¶ 65} In the fifth assignment of error, Tom challenges the trial court's failure to award spousal support. In this regard, Tom claims that Doris earns substantially more annual income and has significantly higher earning abilities.
 {¶ 66} According to R.C. 3105.18(C), the trial court must consider the following factors in deciding if spousal support is appropriate and reasonable:
 {¶ 67} "(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;
 {¶ 68} "(b) The relative earning abilities of the parties;
 {¶ 69} "(c) The ages and the physical, mental, and emotional conditions of the parties;
 {¶ 70} "(d) The retirement benefits of the parties;
 {¶ 71} "(e) The duration of the marriage;
 {¶ 72} "(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;
 {¶ 73} "(g) The standard of living of the parties established during the marriage;
 {¶ 74} "(h) The relative extent of education of the parties;
 {¶ 75} "(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;
 {¶ 76} "(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;
 {¶ 77} "(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;
 {¶ 78} "(l) The tax consequences, for each party, of an award of spousal support;
 {¶ 79} "(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;
 {¶ 80} "(n) Any other factor that the court expressly finds to be relevant and equitable."
 {¶ 81} After considering the circumstances of the parties in detail, the trial court rejected Tom's claim for spousal support. The court concluded that Tom could maintain his standard of living without any contribution from Doris. In particular, the court noted that Tom had separate assets from which he could draw in addition to his division of marital assets.
 {¶ 82} In contending that the court erred, Tom focuses primarily on an alleged disparity in income between the parties. In this regard, Tom contends that he earns a net income of only $4,732 annually from employment as a manufacturer's representative with Omega Sales, $6,000 from managing apartments for his father, and business income from rental properties of about $12,000, after net business loss. In contrast, Doris earns about $48,713 annually as a nurse. Therefore, Tom claims he should have been awarded 39% percent of the difference (about $26,000) as a reasonable percentage of spousal support.
 {¶ 83} We review spousal support decisions for abuse of discretion, meaning that before we can reverse, we must find that the trial court's decision was "unreasonable, arbitrary or unconscionable." Graham v. Graham (1994), 98 Ohio App.3d 396,399, (citation omitted). After considering the evidence, we find no abuse of discretion.
 {¶ 84} At trial, Tom admitted that he lived rent-free at his father's apartment buildings and house, and expected that to continue. In fact, the parties had lived rent-free in one of the father's apartment buildings during their entire marriage. However, in an affidavit of income and expenses, Tom listed various housing expenses, including real estate taxes, utilities, water and sewer, cable, home cleaning and maintenance, etc. Tom admitted at trial that these expenses were for the home at Cyril Court, where his female companion lived. The housing expenses amounted to about $1,165 per month. In addition, Tom spent amounts like $1,000 per month on fuel for his airplanes (a hobby), $400 per month for donations, about $500 per month in gifts to his adult children, and $400 per month on vacations. The total expenses listed were about $5,120 per month, or $61,440 per year.
 {¶ 85} The parties separated in August, 2001, and the final hearings ended in March, 2003, about a year and half later. During the interim, Tom was apparently able to maintain an appropriate standard of living. He did not testify that he had incurred any debt in order to maintain his standard of living, nor did he have to sell assets. During this time, he was able to continue paying the housing expenses of his female companion, and to spend $1,000 per month on airplane fuel. These expenses alone ($13,980 and $12,000, respectively, for an annual total of $25,890) would have exceeded Tom's reported income, without considering expenses for food, clothing, insurance, and so on. In view of these facts, the trial court was correct in concluding that Tom would be able to maintain his standard of living without help from Doris.
 {¶ 86} The trial court also concluded that there was no clear evidence of the rental income derived from the properties. We agree. Although the rental properties grossed significant revenues, the partnership tax returns show losses, due to depreciation and carryover of passive income loss. However, nothing was submitted to show what Tom actually received in rental income, other than "paper losses."
 {¶ 87} Tom was trained as an electrical engineer, but had worked for many years as a manufacturer's representative. Here again, documentation was incomplete, since Tom did not even provide the court with 1099 forms for the years 2000 and 2001. However, accepting as true Tom's testimony that his income as a representative for the year 2000 was very low, and even a negative amount after deductions for business expenses, one might question the utility of continuing to spend time on that profession. Even a minimum wage job would have provided more income.
 {¶ 88} Furthermore, the evidence indicated that Tom routinely billed his father for substantial amounts of work on apartments the father owned. As an example, Tom billed his father in February, 1999, for $560 worth of labor that he and Doris performed, and for $350 in management fees. Similar amounts were billed every month, and some months the amount was more than $2,000. Tom explained that his father wanted to give him money, so he invoiced his father for labor. Tom considered these amounts "gifts" and did not report them on his income tax return.
 {¶ 89} Tom testified that he received all the money for the invoiced labor, including amounts invoiced for Doris, and put the money in both joint and separate accounts. Doris testified, however, that she worked at apartments she and Tom owned, as well as his father's apartments, and never received any money. Tom took all the money from his father, except for one invoice around the time of the parties' separation.
 {¶ 90} According to the evidence, Tom and Doris had about $372,000 equity in real estate, $25,000 in stock, $95,250 in savings accounts, and $167,800 in retirement accounts. Tom was awarded more than half of these assets. In addition, Tom was awarded a $50,000 airplane as separate property. Under the circumstances, we agree with the trial court that Tom had sufficient assets and that spousal support was not warranted.
 {¶ 91} In view of the above discussion, the trial court did not act arbitrarily, unconscionably, or unreasonably in failing to award Tom spousal support. Accordingly, the fifth assignment of error is without merit and is overruled.
 {¶ 92} Because all five assignments of error have been overruled, the judgment of the trial court is affirmed.
Wolff, J., and Young, J., concur.